**In the Matter of the Application for DISCIPLINARY ACTION AGAINST Thomas M. DISSELHORST, A Member of the Bar of the State of North Dakota.**

**DISCIPLINARY BOARD OF the SUPREME COURT of the State of North Dakota, Petitioner,**

v.

**Thomas M. DISSELHORST, Respondent.**

**Civ. No. 880338.**

Supreme Court of North Dakota.

July 17, 1989.

Vivian E. Berg (argued), Disciplinary Counsel, Bismarck, for petitioner.

Kent A. Higgins (argued), Bismarck, for respondent.

---

Thomas M. Disselhorst (argued), Bismarck, for respondent.

ERICKSTAD, Chief Justice.

This is a disciplinary proceeding brought against Thomas M. Disselhorst, an attorney practicing law in Bismarck. Following formal proceedings, a hearing panel of the Disciplinary Board of the Supreme Court made findings and recommended that Disselhorst be publicly reprimanded for his conduct.

We review disciplinary proceedings against attorneys *de novo* on the record with the standard of proof being clear and convincing. *Matter of Ellis*, 439 N.W.2d 808, 809 (N.D.1989). In reviewing the record, we accord due weight to the findings, conclusions, and recommendations of the hearing panel. *Id.* However, this Court does not act as a mere "rubber stamp" approving the findings and recommendations of the Disciplinary Board after a perfunctory review. *Id.* We decide each case on its own particular facts in determining what discipline is warranted. *Id.*

Disselhorst initially represented Kevin Brown in a divorce proceeding which was resolved in the summer of 1985. Kevin contacted Disselhorst in early September of 1985 regarding the possibility of filing a petition in bankruptcy. Later that month, Kevin decided to file a bankruptcy petition and paid Disselhorst $175.00, half of the total fee to be charged, apparently with the understanding that Disselhorst would begin working on the petition once he received the balance of the fee.

In January of 1986, Kevin moved to Abilene, Texas. One month later, Kevin's ex-wife called him and requested that he take care of their son, Preston, for a month. At the time of the divorce, the parties had agreed that she would have custody of Preston. However, after Preston had been living with Kevin for a number of weeks, Kevin decided that he wanted to be the custodial parent. Sometime in March of 1986, Kevin contacted Disselhorst about making a change in the custody arrangement.

Because Kevin was living and working in Texas and found it financially difficult to make numerous long distance telephone calls to Bismarck, his parents, Doralyn and Bob Brown acted on his behalf with respect to the legal matters Disselhorst was handling for Kevin. After moving to Texas, Kevin did not meet with Disselhorst in person. Doralyn Brown testified that she attempted to call Disselhorst at his office March 20, April 2, and April 4, 1986, but was unable to reach him and so left messages on his answering machine. On April 25, 1986, Doralyn went to Disselhorst's office and gave him a check for $200.00. She was given a receipt which indicated that $165.00 was a retainer for the child custody matter and $35.00 was to complete the payment on the bankruptcy matter.

During the month of May, Doralyn attempted to contact Disselhorst five times with no success, each time leaving a message on the answering machine. On June 9, 1986, after again trying to reach Disselhorst by telephone, Doralyn sent him a certified letter, conveying her concern about being unable to contact him and at the lack of progress on the matters of bankruptcy and child custody. Disselhorst did not respond.

Doralyn and her husband, Bob, continued to try to contact Disselhorst by telephone. On July 8, 1986, Kevin retained another attorney in Abilene because he was dissatisfied with the service he had been receiving from Disselhorst. On September 5, 1986, Kevin sent Disselhorst a letter essentially asking him to discontinue all work on Kevin's behalf and requesting that Disselhorst send him all papers and documents in connection with Kevin's cases.

On October 20, 1986, Bob left a message on the answering machine, which Disselhorst returned. Bob indicated that he wanted Disselhorst to send him the documents from the divorce proceeding so that they could be sent to the attorney in Abilene to begin working on the child custody matter. The documents were not returned and on November 3, 1986, Doralyn sent Disselhorst another certified letter requesting the papers. On November 20, 1986,

Doralyn sent a letter to the Disciplinary Board to complain about Disselhorst's conduct.

In letters dated December 5, 1986, and January 27, 1987, Disselhorst sent the Browns the documents and promised to repay them the $600.00 they requested without deduction for any previous related expenses.[1] On May 26, 1986, Doralyn wrote Disselhorst to remind him of his promise to repay the $600. On April 28, 1988, Disselhorst sent the Browns a check for $400.00, and on May 10, 1988, a traveler's check for $200.00 and a promise to pay interest of $151.20.

On April 16, 1987, the Inquiry Committee West met to consider the complaint and unanimously recommended a private reprimand. A Hearing Panel of the Disciplinary Board was convened on May 26, 1988, and July 28, 1988, and after considering the evidence, made findings, including the following:

### "VIII.

"That the above-stated conduct violates Canon 1, DR 1–102(A)(4) of the Code of Professional Responsibility, as follows:

"(A) A lawyer shall not:

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

### "IX.

"That additionally the above-stated conduct violates Canon 6, DR 6–101(A)(3) of the Code of Professional Responsibility, as follows:

"(A) A lawyer shall not:

"(3) Neglect a legal matter entrusted to him.

### "X.

"That additionally the above-stated conduct violates Canon 7, DR 7–101(A)(1), (2), and (3) of the Code of Professional Responsibility, as follows:

"(A) A lawyer shall not intentionally:

"(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

"(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

"(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B)."

The Hearing Panel recommended that Disselhorst be publicly reprimanded.

Disselhorst admits that his conduct was negligent, but takes exception to findings VIII and X and also to the recommendation that he be publicly reprimanded. Dissel-

---

1. Evidence of checks and receipts submitted to the Hearing Panel of the Disciplinary Board indicate the Browns paid Disselhorst the following:

| | |
|---|---|
| 11/27/84 | $175.00 retainer for divorce ($350.00 total fee). |
| 6/27/85 | $275.00 ($100.00 retainer for grandparent rights matter and $175.00 balance on divorce). |
| 9/26/85 | $175.00 (Chapter 7 bankruptcy; $350.00 total). |
| 3/10/86 | $30.00 (no notation). |
| 4/25/86 | $200.00 ($165.00 retainer for child custody matter and $35.00 on the bankruptcy fee). |

Total: $855.00

In a letter to the Browns dated December 5, 1986, Disselhorst states his records indicate fees in the amount of $515.00 for the bankruptcy and child custody matter plus an additional $60.00 filing fee.

horst asserts that, to some extent, his health problems mitigate his conduct.

In April of 1987, Disselhorst was hospitalized with kidney stones. During this hospitalization, he was diagnosed as suffering from hypothyroidism and was started on medication to alleviate the symptoms. A letter to Disselhorst from Dr. Ron Tello was submitted into evidence at the hearing. In this letter, Dr. Tello states:

"The clinical variations of hypothyroidism have a wide spectrum ranging from hardly any recognizable symptoms at all to overt life threatening conditions. The symptoms of hypothyroidism are usually very insidious in onset and are often times present five or more years prior to the diagnosis being established. The earliest complaints of hypothyroidism are often times fatigue, weakness, cold intolerance, and occasional muscle cramps. "As the disease progresses, physical weakness increases and mental slowness develops. Personality changes are often times present as are paresthesias and ataxia. Other symptoms that can develop include constipation, shortness of breath, headaches, decreased hearing, chest pain, and weight gain. Physical signs that can be present include dry scaly skin, puffy eyelids, hoarseness, a yellow skin texture, loss of scalp hair, and abdominal distention. Besides the impaired intellectual function that can develop with long standing untreated hypothyroidism, frank psychosis and even a coma can develop. If left untreated, patients can develop myxedema coma which is quite unusual but often times lethal. This myxedema coma is often times pre-

ceded by seizures and accompanied by hypotension and hypothermia.

"*. . . As far as other symptoms and signs you have developed over a period of time prior to the diagnosis, I could not really comment on since I had seen you only in January of 1987 prior to that hospitalization. At that time, you had a bronchitis.*" [Emphasis added.]

Disselhorst asserts that he had been suffering from hypothryoidism for an undetermined number of years prior to the malady being diagnosed in April of 1987.[2] Since he has been taking medication designed to alleviate the symptoms of hypothyroidism, Disselhorst claims his health is much improved. Disselhorst called several witnesses who testified at the hearing regarding the noticeable change in his appearance and demeanor, generally stating that he appeared more healthy, alert, and energetic after beginning the medication.[3] The Hearing Panel found that Disselhorst's conduct was mitigated by his health problems.

■ Habitual failure to attend to matters entrusted to an attorney and failure to communicate with the client constitutes grounds for discipline. *Disciplinary Bd. of Supreme Court v. O'Neil*, 326 N.W.2d 879 (N.D.1982). We have previously found conduct involving a failure to communicate with clients or return a retainer to warrant a public reprimand. *Matter of Britton*, 406 N.W.2d 364 (N.D.1987). Although Disselhorst's conduct can partly be attributed to health and other personal problems, personal problems do not justify failure to

---

**2.** It is possible that Disselhorst may have suffered from hypothyroidism at the time he began to become neglectful in his representation of Kevin Brown. However, the statement he has provided from Dr. Tello does not assert that this doctor had an opinion based upon reasonable medical certainty that Disselhorst had suffered from hypothryoidism at that earlier time, likely due to the fact that Dr. Tello had not seen Disselhorst prior to January of 1987. *See,* for example, the degree of medical certainty required to prove causation in *Kuntz v. North Dakota Workmen's Compensation Bureau,* 139 N.W.2d 525, 528–9 (N.D.1966). We note that section 65–01–11, N.D.C.C., places the burden upon the claimant to establish his right to par-

ticipate in the Worker's Compensation fund and, therefore, also the burden of proving causation. No similar statute is involved in the instant case. But if a respondent in a case such as this desires to have his or her neglectful conduct excused, a medical opinion justifying that excuse should be based upon reasonable medical certainty.

**3.** The witnesses Disselhorst called on his behalf also testified that Disselhorst often represents clients who have little or no money, apparently taking some of the responsibility for providing legal assistance to those people who may not otherwise receive such assistance.

attend to matters entrusted to an attorney. *See Matter of Ellis, supra; Disciplinary Bd. of Supreme Court v. O'Neil, supra.* We conclude that Disselhorst's conduct was negligent to the extent that it warrants a public reprimand.

■ The Hearing Panel also found that Disselhorst's conduct violated Canon 7, DR 7–101(A)(1), (2), and (3) of the Code of Professional Responsibility, requiring a conclusion that Disselhorst's misconduct was intentional. Our review of the record discloses misconduct that is negligent, not intentional. We therefore reverse this finding of the Hearing Panel.

■ The Hearing Panel further found that Disselhorst violated Canon 1, DR 1–102(A)(4) of the Code of Professional Responsibility which provides that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. We do not find evidence to support this conclusion. While Disselhorst was negligent in failing to communicate with the Browns and in his dilatory handling of their legal concerns, it does not appear that he intentionally misled or deceived them. Furthermore, the Hearing Panel merely found "[t]hat the above-stated conduct violates Canon 1, DR 1–102(A)(4) of the Code of Professional Responsibility, as follows: (A) A lawyer shall not: (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation" without indicating in which respects this violation occurred and without delineating which of the proscribed actions were committed. In the future it is hoped that the findings will be more specific when a violation of DR 1–102(A)(4), or an analogous current Rule is charged.

Consistent with this opinion, we hereby publicly reprimand Thomas Disselhorst for his negligent conduct with regard to his representation of Kevin Brown in conjunction with the matters of bankruptcy and child custody. Pursuant to Rule 21(d) of the North Dakota Rules of Disciplinary Procedure, Disselhorst is ordered to pay for the costs of the disciplinary proceedings in an amount to be determined by the Disciplinary Board.

Payments shall be made in installments over a four-year period as set forth in a payment schedule to be submitted to Disselhorst by the Disciplinary Board. Failure by Disselhorst to pay costs within the four-year period shall result in his automatic suspension from the practice of law, which suspension shall continue until Disselhorst's default on the payment costs has been remedied. *See Matter of Ellis, supra.*

GIERKE, MESCHKE and LEVINE, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I concur in the majority opinion. I write separately to express my concern over the issue of Disselhorst's health problems which was a significant portion of his argument to this court. The findings of the Hearing Panel indicate that "health problems ... were mitigating circumstances in the misconduct." Rule 1.3(C) of the Procedural Rules of Lawyer Disability and Discipline (NDPRLDD) which were effective September 1, 1988, provides: "Mitigating or aggravating circumstances which affect the nature or degree of discipline to be imposed in a matter shall be fully set forth in the opinion disposing of the matter." If this court, in its written opinions, is to "fully set forth" the effect of mitigating circumstances on the discipline imposed it would be helpful if the recommendations of the Hearing Panel would also explain the extent to which the health problems were "mitigating circumstances in the misconduct."

We know that health problems ordinarily do not entirely excuse the conduct of the attorney or shield the attorney from his or her professional responsibilities. *Disciplinary Bd. of Supreme Court v. Amundson,* 297 N.W.2d 433 (N.D.1980). But mitigating circumstances may be considered in determining the nature or degree of discipline. Rule 1.3(C), NDPRLDD; *In re Peterson,* 175 N.W.2d 132 (N.D.1970). If we are to abide by the Rule and explain, in our opinions, how the mitigating circumstances affect the nature or degree of discipline vis

a vis the recommendations of the Disciplinary Panel, then I believe the Panel must also explain in its recommendations to us how those circumstances affected its recommendation. It is perhaps impossible to measure precisely the effect those circumstances have on the recommendation. However, a statement that "health problems were ... mitigating circumstances in the misconduct" does not provide me with an acceptable explanation of the recommendation of the Panel. We should at least be informed whether or not the Panel would have recommended more severe discipline but for the illness, and, if so, to what extent, or whether or not it would have recommended the same discipline notwithstanding the illness and, if so, why.

Were the illness in this instance the major issue to be decided by this court, I would remand for further findings and recommendations by the Panel. But the majority opinion does no more nor no less than the Panel recommended insofar as the nature or degree of discipline to be imposed, i.e., the Panel recommended a public reprimand and the majority opinion imposes a public reprimand, although our reprimand is for negligent, not intentional, conduct, and we do not find conduct involving dishonesty, fraud, deceit, or misrepresentation. Furthermore, as the majority opinion observes in a footnote, the record is somewhat vague, at least from the standpoint of expert medical testimony, as to the time of the onset of the illness and its actual effect on Disselhorst at the time of the misconduct. I therefore concur in the result reached by the majority opinion.

MESCHKE, J., concurs.