**In re Petition for DISCIPLINARY ACTION AGAINST Michael R. LOCHOW, an Attorney at Law of the State of Minnesota indefinitely suspended.**

**No. C8–90–1253.**

Supreme Court of Minnesota.

May 3, 1991.

William J. Wernz, Director, Office of Lawyers Professional Responsibility, St. Paul, for appellant.

Michael J. Hoover, Minneapolis, for respondent.

PER CURIAM.

This case comes before us after the director of the Lawyers Professional Responsibility Board filed a petition for disciplinary proceedings against respondent. The parties stipulated to the facts and the rules of professional responsibility that were violated by respondent. They also stipulated that disciplinary sanctions were appropriate, but disagreed on the proper sanction. The matter was thus referred to a referee who, after a hearing, made findings of fact, conclusions of law, and recommendations. These recommendations were that respondent be suspended for 18 months, pay $750 in costs and disbursements of $2,000, maintain his trust accounts in accordance with board requirements and be subject to 2 years' probation upon reinstatement. Respondent appealed. We concur in all of the referee's recommendations with the exception that there shall be a period of indefinite suspension with respondent being eligible to petition for reinstatement in 6 months.

Although the facts are not in dispute, we deem it necessary to set them out in detail to frame the issues presented in this case.

Respondent has been licensed to practice law in Minnesota since 1982. After graduating from Jamestown College in 1968 and

serving in the military for 3 years, respondent attended law school at the University of North Dakota where he graduated in 1974. He has been licensed to practice in North Dakota since July 1974. After working for various governmental agencies, respondent became a partner with William Gray, forming Gray & Lochow. They were partners from 1979 until 1982, when Gray began working for a life insurance company. Respondent is currently a sole practitioner in Fargo, North Dakota.

The problems arose out of a probate action resulting from the death of Minnesota resident Robert H. Peterson on January 11, 1982, who died in a plane crash. The decedent's wife, Susan Peterson (hereinafter referred to as Peterson), retained Gray & Lochow to probate the estate and resolve other related litigation in Minnesota. Gray & Lochow had done work for the Petersons prior to Mr. Peterson's death and had contact with Susan Peterson in January and February 1982. Susan Peterson was appointed personal representative February 12, 1982.

### First Count:[1] Peterson Estate Fund Violations

On February 8, 1982, Gray & Lochow requested and received $75,000 from Peterson. Respondent deposited the $75,000 in the firm's trust account at Fargo National Bank, then returned $10,000 to Peterson to open an estate account. There is some dispute as to how the remaining $65,000 was to be used. Respondent claims that his understanding with Gray was that the $65,000 was to be used to pay expected attorney fees; however, respondent admits that he never discussed or confirmed this with Peterson. Nothing was memorialized in writing.

Two other transactions occurred on February 8, 1982. Respondent transferred $7,500 from the trust account to the Gray & Lochow business account. This was done without Peterson's knowledge or consent. Also on this date, Gray withdrew

$2,500 from the trust account for his own use and then transferred the remaining $55,000 to a Merrill Lynch cash management account (CMA), all without Peterson's knowledge or consent. These latter transactions by Gray were made also without respondent's consent; however, when he did learn of the transactions, he did not act to reverse them.

The Merrill Lynch CMA was not a properly administered trust account. The referee found, however, that respondent believed that the CMA was a trust account at the time it was opened. The first monthly statement had a "trust account" designation on it although this was dropped after Merrill Lynch determined that it could not be used as a trust account. The CMA could be, and was, used to pay, among other things, credit card charges and checks issued by the account holders. From February 1982 through December 1983, respondent and Gray withdrew $25,700 on checks made out to Gray & Lochow from the CMA with respondent's knowledge and consent. During this time period, respondent individually withdrew $2,250 from the CMA.

In addition to the $2,500 that Gray withdrew in February 1982, from March 1982 through June 1983, Gray individually withdrew a total of $13,000 from the CMA through credit card charges or cash withdrawals. According to the findings of the referee, respondent did not know of Gray's transfers and credit card charges until they appeared on the monthly statement for the CMA. He did nothing to report these withdrawals to Peterson.

On April 28, 1982, respondent requested a $7,500 retainer from Peterson, which she sent and which respondent deposited in the Gray & Lochow trust account. On December 31, 1982, $21,250 was transferred from the CMA to the Gray & Lochow trust account. On November 1, 1983, respondent requested an additional $7,500 retainer from Peterson. This time, however, she did not send respondent the funds, but

---

**1.** The referee and director divided the violations into four counts; for ease of reference, we retain that designation.

authorized him to withdraw the $7,500 from the trust account. From January 1, 1983, through December 1985, respondent periodically withdrew the remaining $21,-250 from the trust account, including the interest earned. Except for the authorization from Peterson for $7,500 in November 1983, all transfers and withdrawals were made without Peterson's explicit knowledge or consent.

The referee found that, based on respondent's understanding that the Peterson funds were to be used for payment of legal fees (an understanding which Gray communicated to respondent but which respondent did not confirm with Peterson), the periodic withdrawals were intended as payment for services which had been or would be rendered. Respondent admits that the procedures utilized in withdrawing funds were inappropriate because: (1) he did not send periodic billings to Peterson to account for the funds; (2) he did not advise her of withdrawals as they occurred; and (3) he failed to preserve appropriate records to substantiate the withdrawals, including a record of services performed, the time devoted thereto, and the reasonable value thereof. Accordingly, respondent admits that the withdrawals from the Peterson funds violated DR 9–102(A)(2), Minn.Code Prof.Resp. (1985) and Minn.R.Prof.Conduct 1.15(a)(2). He also admits that the CMA was not a properly administered trust fund and violated DR 9–103, Minn.Code of Prof. Resp. Furthermore, respondent's failure to provide periodic accounting to Peterson for claimed fees violated DR 9–102(B)(3), Minn.Code of Prof.Resp. and Minn.R.Prof. Conduct 1.15(b)(3). Finally, the withdrawals by means other than check from the CMA and trust account violated Lawyers Professional Board Opinion No. 11.

### Second Count: Misrepresentations to the Court and Unreasonable Fees

After respondent filed a Final Account and Amended Final Account listing attorney fees, and after hearing on the matter, the district court approved the accounting and the probate estate was closed. In June 1988, after securing new counsel, Peterson filed an order to show cause on the appro-priateness of the fees. Respondent testified at the hearing to show cause before the district court that $72,500 was charged as attorney fees; that he had maintained records of his withdrawals from the trust accounts; that the fee charged was directly related to the number of hours spent on the estate; and that he had the exact numbers at his office. Respondent also stated at the hearing to show cause that he would provide the court with a record of disbursements from the trust.

Respondent later filed an affidavit and accounting with the court. He did not provide the court with the number of hours spent on the estate. As the referee found, and respondent concedes, the accounting with the court was false and misleading:

> The accounting did not show that withdrawals were made by Visa charges against the CMA. The accounting did not show that some disbursements were made to respondent or Gray individually, instead representing that all withdrawals from trust were to the law firm business account. The accounting also did not show transfer of funds from the trust account to the CMA account or to the Norwest Bank savings account although respondent testified he did not believe this omission was false or misleading.

Respondent concedes that these misrepresentations to the court violated Minn.R. Prof.Conduct 3.3(a)(1), (4), 8.4(d).

After the hearing to show cause, the court held that the attorney fees of $72,500 were excessive and unreasonable. The court ordered respondent to refund $36,250 to Peterson. In the court's findings of fact and conclusions of law, it found that the fees were neither justified by the time and labor spent on the project nor warranted by the experience and expertise of respondent. The court found that the fees were in excess of that which is customarily charged for such services. After the order, respondent and Peterson, who was represented by independent counsel, executed a settlement whereby the order was compromised requiring a refund by respondent to Peterson of $15,000 in exchange for full release of all claims. Respondent concedes, at least

to the extent of the $15,000 settlement, that the fees were excessive and unreasonable in violation of Minn.R.Prof.Conduct 1.5

### Third Count: Neglect of Estate Matters

Respondent began probate of the estate in February 1982 and, for the next 6 months, filed the appropriate papers and documents. However, the inventory and appraisal of the estate was not filed until October 13, 1983. The court, in its findings after the hearing to show cause, held that respondent had failed to file the estate inventory and close the estate in a timely manner and failed to respond to the court.

Between October 1983 and January 1985, respondent filed income tax-related documents, but did not file any documents with the court. On January 31, 1985, the court wrote to respondent and inquired when the estate would be closed. Respondent stated that a lawsuit against the estate was settled on February 5, 1985, and that the estate would be closed within 30 days. As the referee noted, the lawsuit was not settled until June 1985. Respondent admits that there was no reason why the estate was not closed soon after this date.

From June 1985 through January 1987, the court wrote to respondent numerous times inquiring why the estate was not closed. On several occasions, respondent did not reply to the court's letters or telephone calls. When respondent did reply, he either assured the court that the estate would be closed shortly or requested extensions. On May 14, 1987, the court issued an order to show why the personal representative should not be removed and the attorney reported to the director of the Lawyers Professional Responsibility Board. At the July 1, 1987 hearing to show cause, respondent told the court that he had no excuse for the delay and that it was not the fault of the personal representative. On July 1, 1987, a Final Account was filed with the court and, on July 31, 1987, an Amended Final Account was filed. The estate was then closed.

Respondent concedes that his failure to close the estate promptly after June 1985 and his failure to respond to the court violated DR 6–101(A)(3), Minn.Code of Prof.Resp. and Minn.R.Prof.Conduct 1.3.

### Fourth Count: Misrepresentations to the Board

In the initial contact by the director's office, respondent was asked to account for the $82,500 paid to him by Peterson. In response, on June 30, 1989, respondent provided a three-page statement with an accounting attached which stated, falsely, that the accounting represented: (1) that the transfer of funds was from the law office trust account; (2) that the $7,500 Peterson paid in May 1982 was deposited in the same trust account; and (3) that all withdrawals were by check, transferring funds to the firm's business account.

As the referee noted in the findings, the actual facts were as follows:

A. Respondent knew that there were three separate accounts (law office trust account, CMA, and trust savings account) into which the Peterson funds had been deposited as trust funds.

B. The May 1982 check for $7,500 was deposited in the business account. Although respondent did not intentionally misrepresent this fact on June 30, 1989—he testified that he had assumed the funds went into trust—he admits that he should have checked his records prior to responding to the director's office and making this representation.

C. Respondent knew that withdrawals were made by charges and checks drawn against the CMA, and later transfers from a savings account and some withdrawals were not deposited to the business account.

On July 20, 1989, the director made a second inquiry regarding details about the June 30 response. The director requested further documentation, including bank statements and deposit and withdrawal slips. On August 14, 1989, respondent provided various documents showing only some of the deposits and transfers.

On August 22, 1989, the director made a third inquiry, this time requesting respondent's trust account books and records. On September 16, 1989, respondent revealed for the first time that there had been three accounts. He provided three subsidiary ledgers. These ledgers showed that the withdrawals and transfers were not made contemporaneously with the transactions, but were made in response to the director. Respondent also provided, for the first time, the CMA statements which showed withdrawals by credit card.

The referee held, and respondent again conceded, that these misrepresentations to the director's office violated Minn.R.Prof. Conduct 8.1(a)(1), 8.4(d).

### Mitigation

As noted earlier, respondent is presently a sole practitioner in Fargo, North Dakota. At the time respondent handled the Peterson matter, he had been in private practice for only 3 years and had not handled an estate as large as the Peterson estate.

Since January 1987, respondent has been a part-time North Dakota District Court Referee, hearing juvenile cases and motions in family law matters. Since this appointment, respondent has engaged in part-time practice, consisting primarily of office practice and bankruptcy cases outside his judicial district. Respondent has never been disciplined in Minnesota. However, respondent has received a private sanction from North Dakota for not withdrawing from a family law matter after his appointment as a referee.

Respondent has been involved in *pro bono* service in his law practice. From 1980 to 1987, respondent participated in a North Dakota State Bar Association panel of attorneys who handled marriage dissolution for low-income clients. Since 1984, respondent has been a Judicare attorney for Northwest Minnesota Legal Services, handling family law matters in Clay County. Respondent has also assisted in the formation of nonprofit corporations in North Dakota, including the incorporation of a home for teenage girls and the incorporation of the North Dakota Homeless Coalition.

The referee also noted that respondent has been involved in community activities, including work for United Way, fundraising for multiple sclerosis, and volunteer work for the homeless and the elderly. Regarding the excess attorney fees, the referee did note the following:

> Although respondent never communicated directly with Peterson about using the Peterson funds for attorney's fees, Peterson did realize, although she did not give explicit authorization and consent, that the funds were being used for attorney's fees. This realization arose from the fact that she understood that the firm was working on the matter, and that respondent had never talked to her and told her that there would be a refund of any of the funds. Peterson's realization became firm when she was given the final account in July 1987 to sign, and did see that the final account listed $75,000 in attorney's fees.

Finally, the referee noted that, had there been a full evidentiary hearing, three attorneys would have given testimony regarding respondent's reputation in the community and his being a person of honesty and integrity.

The issue presented to us is the appropriate sanction for respondent's misconduct.

■■■■ The primary purpose of attorney discipline is protection of the public. *In re Serstock*, 316 N.W.2d 559, 561 (Minn.1982). In considering appropriate sanctions for misconduct, this court weighs the following factors: (1) the nature of the misconduct, (2) the cumulative weight of the disciplinary rule violations, (3) the harm to the public, and (4) the harm to the legal profession. *In re Smith*, 381 N.W.2d 431, 434 (Minn.1986). Sanctions are imposed according to the unique facts of each case, but earlier cases are useful for drawing analogies. *In re Wareham*, 413 N.W.2d 820, 821 (Minn.1987).

### Trust Account Improprieties and Excessive Fees

Respondent points to the referee's finding that there was no misappropriation of funds:

However, because respondent had a claim of right to the funds, i.e., fees earned or to be earned, technical misappropriation is denied; the Director's Office concedes such allegation is not proved; and no finding of misappropriation of client funds is made.

Respondent also states, citing ABA standards, that, where client funds are separately maintained, but sloppy bookkeeping makes it difficult to determine the state of the client trust account, admonition is appropriate. *Standards for Imposing Lawyer Sanctions* commentary to standard 4.14 (1986). Furthermore, although respondent concedes that some sanction for the improprieties is appropriate, he notes that, even where inadequate trust procedures result in misappropriation, suspension did not always follow. *In re Fling*, 316 N.W.2d 556, 558 (Minn.1982) (attorney did not intentionally convert funds, but misappropriation was not excused because of mismanagement; attorney required to pay retribution and allow supervision of trust account by another attorney). The director responds, citing standard 4.12, that failure to maintain a proper trust account is a serious violation:

Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

*Standards for Imposing Lawyer Sanctions* standard 4.12. Furthermore, the director maintains that the fees taken from the accounts amount to a depletion of client trust funds without justification. While the referee did not find misappropriation, the director notes that the withdrawals are suspect and reflect on respondent's honesty. The director submitted exhibits showing that respondent's file inventory does not reflect the hours necessary to account for the fees.

■ With respect to the withdrawals by respondent and Gray and the failure to hold the funds in a proper trust account, respondent concedes that the procedures were inappropriate. However, respondent contends that the current status of Minne-

sota law as to the appropriate placement of funds used essentially for services rendered makes the 18–month suspension too severe. Respondent notes that a minority of jurisdictions allows advances for future services to be put into the attorney's business account. As authority for this proposition, respondent cites ABA/BNA Lawyers' Manual on Professional Responsibility 45:101:

Funds belonging only in part or potentially to the lawyer, such as advance fees * * * usually must be deposited in clients' trust accounts, and may be withdrawn only when there is an accounting and severance of interests or when advanced fees are actually earned by the lawyer. A minority view permits lawyers to deposit advanced fees in their personal accounts and then refund any unearned portion at the end of the representation.

In a recent edition of the Minnesota *Bench & Bar*, the director stated:

If the fee is an *advance for future services*, the majority view is that it must be deposited in the trust account and withdrawn only as earned. In Minnesota, the Director's Office has taken the majority view on fees for future services. This view has also been applied in at least two lawyer discipline decisions of the Minnesota Supreme Court. *In re Green*, unpublished order (Minn., March 6, 1984); *In re Getty*, 452 N.W.2d 694 (Minn.1990).

Wernz, *Ethics Opinions*, Bench & B. Minn., May–June, 1990, at 18. Respondent contends that *Green* is no authority because it is unpublished. Furthermore, he argues that language in *Getty*, by implication, supports his view that the Peterson funds, as services to be earned, need not be put in a trust account. In *Getty*, the attorney offered to represent a client for a flat fee of $10,000. A dispute arose between Getty and the client, and Getty offered to refund a portion of the funds. This court stated that there was no evidence that Getty earned the right to the $10,000 retainer, either before or after his representation. *Id.* at 698. Respondent relies on this court's statement that the attorney admitted that he did not place the $10,000 in

trust "when a dispute arose concerning the funds." *Id.* Respondent here contends that this language implies that the funds do not have to be placed in trust until a dispute arises. We disagree.

As the director notes, it has long been the view in Minnesota that advance payments for future services are client funds until earned:

> Retainers are a source of confusion in many cases. Retainers which are charged to ensure the lawyer's availability for the case may, if reasonable, be non-refundable and earned at the time they are collected. Other retainers may be advances by the client to be applied to future costs and services. Such retainers are not earned at the time they are collected and should be placed in the trust account. Withdrawals should be made only as services are performed and costs incurred in behalf of the client. In all events, the exact nature of the retainer should be made clear to the client at the time the retainer is paid.

Hoover, *Many Ethics Complaints are Completely Avoidable,* Bench & B. Minn., Feb. 1982, at 21. Minnesota has been at the forefront of trust account recordkeeping and compliance. In what the ABA/BNA Manual calls the "Minnesota Model," since 1976, Minnesota has spelled out the requirements of trust accounting and recordkeeping with special emphasis on keeping the client apprised of the use and location of such funds. *See Opinion No. 9,* Bench & B. Minn., May–June 1976, at 58–59.

■ It appears to this court, however, that the question of the use of the $72,500 was largely a dispute over fees. The misconduct consisted of failing to advise the client properly when withdrawals of money for attorney fees and costs were being made and to explain, justify and give accountings thereof. The referee found that respondent believed that the money placed in the Merrill Lynch account was in trust, and the director concedes that there has been no misappropriation of funds. Moreover, the amount of attorney fees was ulti-

mately compromised after the dispute became apparent.

■ We do feel an obligation to advise the bar that this court is getting increasingly alarmed at the numerous cases of trust account violations by lawyers of this state. The number of instances of notorious cases should have by now alerted lawyers to the seriousness of this problem. We thus can no longer treat lightly any abuse of trust accounts. Moreover, these violations are becoming increasingly costly to every lawyer in this state. Therefore, we feel compelled to advise the bar that misuse of trust accounts in the future will (1) almost invariably result in lengthy suspension at the very least and disbarment at worst and (2) that retainer fees not immediately placed in a trust account will be looked upon with suspicion. We are fully aware that there may be cases when the client's desire to have a particular attorney represent him or her will necessitate an immediate commitment. That attorney will possibly have to forego representation of other clients and might lose other business while the attorney commits him- or herself to the client now seeking representation. Such a retainer fee, if reasonable, may be immediately earned. However, the purpose of the retainer fee and the consent of the client for the payment and use thereof must be reduced to writing and approved by the client. Furthermore, attorney fees for payment of services to be performed in the future must be placed in a trust account and removed only by giving the client notice in writing of the time, amount, and purpose of the withdrawal, together with a complete accounting thereof.

### Misrepresentations to the Court and the Director and Neglect of the Probate Estate

In addition to the trust account improprieties, respondent also concedes making misrepresentations to the court regarding the fees and to the director regarding the trust account arrangement and neglecting the probate estate.

As noted earlier, respondent filed with the trial court at the hearing to show cause an affidavit which gave an accounting regarding the attorney fees issue. This accounting did not reveal that some withdrawals were made by Visa through the CMA or that some were paid directly to the Gray & Lochow business account. Respondent argues that these facts were immaterial to the issue being litigated, *i.e.*, attorney fees. Thus, he contends, the misrepresentation was not harmful. As this court noted in *In re Schmidt*, 402 N.W.2d 544 (Minn.1987), when "a lawyer demonstrates a lack of that truthfulness and candor that the courts have a right to expect of their officers to the end that the system of justice will not be undermined, courts do not hesitate to impose severe discipline." *Id.* at 548. The proper focus then is not on the harm caused by the attorney, but the fact that misrepresentations were made before a judicial officer.

Regarding the misrepresentations to the director, respondent cites cases where more egregious misrepresentations have been made and less discipline imposed. *See In re Dowdal*, 284 N.W.2d 394 (Minn.1979) (client's signature forged on an affidavit submitted to the court—public reprimand); *In re Holmay*, 399 N.W.2d 564 (Minn.1987) (client's signature forged, document falsely notarized, presented to the judge, and served on opposing party—30-day suspension). While it is true that misrepresentation to the director alone, in the proper fact situation, may not warrant a long suspension; in conjunction with violation of other rules, the behavior becomes more egregious.

As to the delay in closing the estate involved here, we must accept the fact that it was a large estate. The responsibility was vast for a young and inexperienced attorney, and there was some justification for delay caused by the settlement of a lawsuit in connection with the decedent's death and the tax consequences to the estate.

Thus, the discipline boils down to the proper sanction for the misrepresentations and deceptive statements made to the court and the director by respondent. There is no question that respondent withheld information about the CMA and the improper withdrawals made by credit card from that account even after respondent was aware that the uses were improper. Respondent had a duty to admit the improprieties to the court and the director when inquiry was made. Instead, respondent chose to engage in a series of misleading and deceptive disclosures to both the court and the director. For that, he must be disciplined.

In looking at all the cases cited by counsel for both parties and the mitigating factors, we have concluded that an 18-month suspension is too severe a penalty for the infractions which have occurred and that 6 months is a more appropriate suspension. We do adopt all the referee's other findings and recommendations.

Accordingly, it is ordered by this court:

1. That, upon filing of this order, respondent is immediately indefinitely suspended from the practice of law in the State of Minnesota. He shall not be eligible to petition for reinstatement for a period of at least 6 months.

2. Respondent shall pay $750 in costs and $2,000 in disbursements pursuant to the agreement of the parties made in this proceeding and Rule 24, Rules on Lawyers Professional Responsibility.

3. Should a petition for reinstatement be granted following the 6 months aforesaid, respondent shall be subject to 2 years' supervised probation under a Minnesota attorney concerning any cases arising in Minnesota courts or involving Minnesota clients and shall maintain his trust account, books and records required by Opinion No. 9 of the Lawyers Professional Responsibility Board and shall comply with any of the other conditions normally requested as conditions precedent for a petition for reinstatement.