**DISCIPLINARY BOARD, Petitioner,**

v.

**William Elton GRAY, Respondent.**

**Civil No. 950283.**

Supreme Court of North Dakota.

Feb. 28, 1996.

Vivian E. Berg (argued), Disciplinary Counsel, Bismarck, for petitioner.

Randolph E. Stefanson (argued) of Stefanson, Plambeck & Foss, Moorhead, for respondent.

LEVINE, Justice.

A hearing panel of the Disciplinary Board found that attorney William E. Gray mishandled a client's trust account in violation of DR 9–102 of the North Dakota Code of Professional Responsibility (N.D.C.P.R.), and recommended that his certificate of admission to practice law be suspended for six months under Standard 4.12 of the North Dakota Standards for Imposing Lawyer Sanctions (N.D.S.I.L.S.). The Disciplinary Board accepted the hearing panel's findings and recommendation. We accept the finding that Gray violated DR 9–102, N.D.C.P.R.; however, we direct that Gray receive a public reprimand for his misconduct and that he pay $4,091.50 in costs and expenses for this proceeding.

Some facts associated with this disciplinary proceeding are reported in disciplinary proceedings against Gray's former partner, Michael R. Lochow. *See Matter of Application for Disciplinary Action against Lochow,* 502 N.W.2d 252 (N.D.1993) (*Lochow II* ); *In re Petition for Disciplinary Action Against Lochow,* 469 N.W.2d 91 (Minn.1991) (*Lochow I* ).

Gray was admitted to practice law in this state in October 1977. In 1979, Gray and Lochow formed a law partnership, Gray & Lochow, in Fargo. Gray prepared an estate plan and wills for Robert and Susan Peterson of Breckenridge, Minnesota. In late 1981, Gray drafted a codicil to Robert's will to permit his estate to qualify for favorable estate tax treatment under the Economic Recovery Tax Act, which became effective on January 1, 1982. However, Robert never signed the codicil, and in January 1982, he and his son, Bradley, were killed in an airplane crash.

In January 1982, Susan retained Gray & Lochow to probate Robert's estate and to resolve other related matters. There was no written fee agreement between the parties. However, Susan testified that there was a verbal agreement for the firm to charge her $50 per hour, and that she paid Gray & Lochow $75,000 for "estate bills." According to Gray, he charged $90 per hour for tax work and $75 per hour for general legal work, and the $75,000 payment "was a composite of fees, expenses and marshaling assets for what at the time looked like a formidable tax bill."

The $75,000 was initially deposited in the firm's trust account. Later, Gray & Lochow returned $10,000 to Susan to open an estate account to pay bills in her capacity as personal representative for Robert's estate. In February 1982, without Susan's knowledge,

Gray transferred the remaining $65,000 from the firm's trust account to three other accounts: (1) $7,500 to the law firm's office account, (2) $2,500 to a cash management account in Gray's name, and (3) $55,000 to a Merrill Lynch cash management account (Merrill Lynch CMA). In April 1982, upon request by Lochow, Susan paid him an additional $7,500 retainer, which was deposited in the firm's office account. In November 1983, Lochow asked Susan for an additional $7,500 retainer, and she directed him to withdraw that amount from the remaining $65,000 that she had initially paid the firm.

Meanwhile, Gray quit the practice of law and began working for E.F. Hutton in Minneapolis in February 1982. There was no formal partnership dissolution agreement between Gray and Lochow. However, Lochow assumed primary responsibility for the representation of Susan, and, for purposes of winding up the partnership, Gray performed legal services for Susan on two matters—an action for Bradley's wrongful death, and tax work for Robert's estate. As a result of Gray's efforts in pursuing an unlimited marital tax deduction, Robert's estate saved about $300,000 in potential estate tax liability, in spite of Robert's failure to sign the codicil to his will. Gray also negotiated a $50,000 wrongful death settlement for Bradley's estate.

In 1982 and 1983, Gray withdrew about $13,000 from the Merrill Lynch CMA for airline tickets, motel and restaurant charges, cash advances, service station charges, and transfers to his personal CMA. According to Gray, those withdrawals represented his accrued charges for 181.35 hours of his legal work. Although Merrill Lynch provided Lochow with monthly statements showing Gray's withdrawals from the CMA, Gray did not provide Susan or Lochow with a billing for his legal work or an accounting for his withdrawals. Gray completed his work on

Bradley's wrongful death action and on Robert's estate by late 1982 or early 1983. Lochow did the remainder of the work on Robert's estate, which was ultimately closed in 1987. By that time, the remaining $65,000 in the Merrill Lynch CMA had been dissipated without an accounting to Susan.

In June 1988, after securing different counsel, Susan challenged the reasonableness of attorney fees charged to probate Robert's estate. Lochow submitted an affidavit and accounting, and testified at an order to show cause hearing that Susan was charged $72,500 in attorney fees. The Minnesota probate court found that attorney fees of $72,500 were excessive and unreasonable, and ordered Lochow to refund $36,250 to Susan. Lochow and Susan then executed a settlement in which Lochow agreed to refund $15,000 to Susan in exchange for a full release of her claims. After that settlement, Gray paid Lochow $7,500.

Susan then filed a complaint against Lochow with the disciplinary boards in Minnesota and North Dakota. The Minnesota Supreme Court found that Lochow failed to properly administer the Merrill Lynch CMA trust account, charged excessive attorney fees, failed to promptly close Robert's estate, and made misrepresentations to the Minnesota probate court and the Minnesota director of lawyer discipline. The court indefinitely suspended Lochow's Minnesota license and ordered that he not be eligible to petition for reinstatement for at least six months. *Lochow I.* In reciprocal disciplinary proceedings, we cited the same misconduct by Lochow, and we imposed the identical sanction against him. *Lochow II.*

Meanwhile, this disciplinary proceeding was commenced against Gray. After a formal hearing, the Board concluded that the Merrill Lynch CMA was a client trust account and that Gray violated DR 9–102(A)(2) and (B)(3), N.D.C.P.R.,[1] in failing to render

1. The N.D.C.P.R. was in effect in North Dakota from January 1, 1977 through December 1987, when it was replaced by the current North Dakota Rules of Professional Conduct.

DR 9–102(A)(2), N.D.C.P.R., said:

"(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more

identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

\*    \*    \*    \*    \*    \*

"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the

an appropriate accounting and maintain complete records for the account, and to provide Susan with an opportunity to dispute his withdrawal of funds from that account. Finding Susan's vulnerability was an aggravating factor and Gray's lack of prior disciplinary record was a mitigating factor, the Board recommended that Gray be suspended from the practice of law for six months and that he pay costs and expenses associated with his disciplinary proceeding.

■■■ We review disciplinary proceedings against attorneys *de novo* on the record under a clear and convincing standard of proof. *Matter of Disciplinary Action Against Rau*, 533 N.W.2d 691 (N.D.1995). We accord due weight to the findings, conclusions, and recommendations of the Board; however, we do not act as a mere "rubber stamp" for those findings and recommendations. *In the Matter of Application for Disciplinary Action Against Disselhorst*, 444 N.W.2d 334 (N.D. 1989). We decide each case on its own facts to determine whether there is professional misconduct and, if so, what discipline is warranted. *Id.*

■■■ We agree with the Board that the Merrill Lynch CMA constituted a trust account and that Gray mishandled that account in violation of DR 9–102(A)(2) and (B)(3). *See Lochow II*, 502 N.W.2d at 254 ("Lochow's transfers and withdrawals of funds without Peterson's knowledge or consent and without periodic accountings to Peterson violated" DR 9–102 N.D.C.P.R.). *See also* N.D.Rules of Professional Conduct 1.15. Our disciplinary rules and cases have long recognized that mishandling a client's funds and commingling a lawyer's funds with a client's funds constitute misconduct. *See Matter of Larson*, 450

N.W.2d 771 (N.D.1990); *Matter of Overboe*, 403 N.W.2d 1 (N.D.1987); *Matter of Lee*, 283 N.W.2d 179 (N.D.1979); *Matter of Jelliff*, 271 N.W.2d 588 (N.D.1978); *Matter of Walton*, 251 N.W.2d 762 (N.D.1977). The evidence clearly and convincingly establishes that Gray commingled Susan's funds with the firm's funds and did not provide Susan with a billing for his legal work or an accounting for his withdrawals from the Merrill Lynch CMA. Because of those deficiencies, Susan was not afforded an opportunity to dispute Gray's withdrawals of those funds for his claimed legal work. We conclude Gray violated DR 9–102(A)(2) and (B)(3), N.D.C.P.R.

However, we conclude that Gray's misconduct warrants a public reprimand under the N.D.S.I.L.S., which we adopted in 1988 from the American Bar Association's *Standards for Imposing Lawyer Sanctions* (February 1986). *See Matter of Becker*, 504 N.W.2d 303 (N.D.1993). Those standards establish a flexible and comprehensive model for imposing sanctions for lawyer misconduct. N.D.S.I.L.S. 1.3.[2]

The N.D.S.I.L.S. outlines a "theoretical framework" for imposing sanctions against lawyers who are guilty of professional misconduct. *See* A.B.A. *Standards for Imposing Lawyer Sanctions*, Commentary at pp. 5–7. That theoretical framework directs a court to consider: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the extent of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. N.D.S.I.L.S. 3. *See* A.B.A. Commentary at pp. 5–7. Under that framework, a court should examine the first three criteria to make an "initial determination" of

---

portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."

DR 9–102(B)(3), N.D.C.P.R., said:

"(B) A lawyer shall:

     ❖    ❖    ├    ❖    ❖    ❖

"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

2. N.D.S.I.L.S. 1.3 says, in part:

"The standards constitute a model, setting forth a comprehensive system for determining sanctions, permitting flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct. They are designed to promote: (1) consideration of all factors relevant to imposing the appropriate level of sanction in an individual case; (2) consideration of the appropriate weight of such factors in light of the stated goals of lawyer discipline; (3) consistency in the imposition of disciplinary sanctions for the same or similar offenses within and among jurisdictions."

the appropriate sanction and then should apply any relevant aggravating or mitigating factors to impose a specific sanction. A.B.A. Commentary at p. 7. We apply the framework from the N.D.S.I.L.S. to decide the appropriate sanction for Gray's misconduct.[3]

In determining the ethical duty violated by a lawyer, the N.D.S.I.L.S. recognizes the respective duties owed to clients, N.D.S.I.L.S. 4; the public, N.D.S.I.L.S. 5; the legal system, N.D.S.I.L.S. 6; and the profession, N.D.S.I.L.S. 7. Here, Gray violated his duty to preserve a client's property. N.D.S.I.L.S. 4.1 explains the range of sanctions for failure to preserve a client's property:

> "*4.1 Failure to Preserve the Client's Property.* Absent aggravating or mitigating circumstances, upon application of the factors set out in 3.0, the following sanctions are generally appropriate in cases involving the failure to preserve client property:
>
> "4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.
>
> "4.12 Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.
>
> "4.13 Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.
>
> "4.14 Admonition is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client."

N.D.S.I.L.S. 4.1 differentiates among sanctions based upon the lawyer's mental state and the extent of actual or potential injury caused by the lawyer's misconduct. Here, the Board recommended that Gray be suspended under N.D.S.I.L.S. 4.12, implicitly finding that he knew or should have known that he was dealing improperly with client property and caused injury or potential injury to the client. Gray's misconduct, in part, contributed to Susan being charged more than $36,000 in excessive and unreasonable attorney fees, which she did not fully recoup and which caused her injury or potential injury within the meaning of N.D.S.I.L.S. 4.1.[4]

In determining Gray's mental state, we consider the difference between "knows or should know" and "negligence." The N.D.S.I.L.S. defines "knowledge" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result," and "negligence" as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." N.D.S.I.L.S. Definitions. There is no bright line between the mental state of "knows or should know" and that of "negligence." For purposes of preserving a client's property, the A.B.A. Commentary to 4.1 suggests that suspension is appropriate for lawyers who commingle their funds with client funds in a manner that is "grossly negligent," and that reprimand is appropriate for lawyers who are "merely negligent" in dealing with a client's

---

3. Although Gray's misconduct occurred before the N.D.S.I.L.S. was adopted, both Gray and the Board cite the N.D.S.I.L.S. as governing this disciplinary proceeding. In the absence of any contrary argument, we apply the N.D.S.I.L.S. to this case. As will be apparent by our subsequent discussion, the N.D.S.I.L.S. effectively approved guidelines that are similar to factors we have relied upon in our prior caselaw. *See Matter of Overboe*, 403 N.W.2d 1 (N.D.1987); *Matter of Lee*, 283 N.W.2d 179 (N.D.1979); *Matter of Jelliff*, 271 N.W.2d 588 (N.D.1978); *Matter of Walton*, 251 N.W.2d 762 (N.D.1977).

4. The N.D.S.I.L.S. Definitions say:

"'Injury' is harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury.

\* \* \* \* \* \*

"'Potential injury' is the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

funds. The A.B.A. Commentary at p. 37 explains

"[L]awyers who are grossly negligent in failing to establish proper accounting procedures should be suspended; reprimand is appropriate for lawyers who simply fail to follow their established procedures. Reprimand is also appropriate when a lawyer is negligent in training or supervising his or her office staff concerning proper procedures in handling client funds."

There was no evidence that the partnership had established appropriate accounting procedures for clients' funds, or that Gray inadvertently failed to follow established office procedures. At the time of Gray's actions, it was well established that commingling of lawyer and client funds was restricted by DR 9–102(A)(2), and that an appropriate accounting to clients was required by DR 9–102(B)(3). *See Lochow II; Larson; Overboe; Lee; Jelliff; Walton.* Generally, we have suspended lawyers for mishandling of a client's funds or commingling a lawyer's funds with a client's funds. *See Larson; Overboe; Jelliff; Walton. Compare Lee* (public reprimand appropriate for commingling funds where there were mitigating factors); *Becker* (private reprimand appropriate where client's property was stolen from lawyer's car, but lawyer's negligence resulted in little or no actual injury after prompt restitution).

Although Lochow bears most of the responsibility for the firm's handling of the Merrill Lynch CMA after Gray left the practice of law in 1982, we cannot disregard or diminish Gray's own failure to provide an accounting for his legal work or for his withdrawal of funds from the Merrill Lynch CMA. Under these circumstances, we decline to minimize Gray's misconduct by labeling it as "merely negligent." We believe the evidence clearly and convincingly establishes that Gray had a conscious awareness of the nature and attendant circumstances of his own misconduct. We conclude that Gray knew or should have known that he was dealing improperly with the Merrill Lynch CMA and that his misconduct caused actual or potential injury to Susan. Under the N.D.S.I.L.S., that conclusion leads to an "initial determination" that the appropriate sanction for Gray's misconduct ordinarily would be a suspension.

However, our inquiry does not end here. We must apply any relevant mitigating or aggravating factors under N.D.S.I.L.S. 9. *See* A.B.A. Commentary at p. 7. Here, the Board found as an aggravating factor that Susan was vulnerable and as a mitigating factor that Gray had no prior disciplinary record. We do not discount that Susan was vulnerable during this time period. However, we believe other mitigating factors, which the Board did not consider, warrant a different sanction.

Gray's misconduct occurred while the partnership was being dissolved. There was no formal dissolution agreement or division of labor for the partnership, but Lochow assumed primary responsibility for the representation of Susan. Although Gray bears full responsibility for his own misconduct, we decline to saddle Gray with onus for Lochow's later, and far more serious, ethical violations. *See Lochow II*, 502 N.W.2d at 254–55 ("Lochow's deceptions and misrepresentations, more than Lochow's other misconduct, call for severe discipline.").

The petition for discipline against Gray initially charged him with dishonesty, fraud, deceit, and misrepresentation under DR 1–102(A)(4), N.D.C.P.R. However, the Board did not find that Gray violated that provision, and Board counsel's assertions that Gray made misrepresentations to the Minnesota probate court are not supported by clear and convincing evidence. The absence of any specific finding of misconduct of that nature is conspicuous. Consequently, we decline to extend the Board's finding that Gray violated N.D.C.C. § 27–14–02(7) [5] to include a finding

---

5. Section 27–14–02(7), N.D.C.C., says:

*"Causes for suspension or revocation of certificate of admission to bar.* The certificate of admission to the bar of this state of an attorney and counselor at law may be revoked or suspended by the supreme court if he has:

\*    \*    \*    \*    \*    \*

"7. Committed any other act which tends to bring reproach upon the legal profession. The enumeration of certain grounds for dis-

of dishonesty, fraud, deceit, or misrepresentation. The lack of dishonest or selfish motive is a mitigating factor which is applicable to this proceeding. N.D.S.I.L.S. 9.32(b).

Gray's legal efforts augmented Bradley's estate and Robert's estate. As a result of Gray's services, Bradley's wrongful death claim was settled for $50,000 and Robert's estate avoided about $300,000 in potential estate tax liability. Gray charged about $15,000 for his work. In considering the appropriate sanction for Gray's misconduct, we cannot ignore those good results fairly obtained.

After Lochow refunded $15,000 to Susan for excessive attorney fees, Gray reimbursed half that amount to Lochow. Efforts to rectify consequences of misconduct are a mitigating factor. N.D.S.I.L.S. 9.32(d). At the time of Gray's misconduct, he was a relatively inexperienced lawyer, which also is a mitigating factor. N.D.S.I.L.S. 9.32(f). Moreover, Gray has no other disciplinary record. N.D.S.I.L.S. 9.32(a).

After weighing the mitigating factors, we conclude that a public reprimand is the appropriate sanction for Gray's misconduct. It brings to bear our condemnation of his misconduct while giving attention and credence to the unusual array of extenuating, mitigating factors. We direct that William E. Gray receive a public reprimand for his misconduct and that he pay $4,091.50 in costs and expenses associated with this disciplinary proceeding.

VANDE WALLE, C.J., and MESCHKE, J., concur.

SANDSTROM, Justice, dissenting.

Because I would impose the sanction recommended by the Disciplinary Board, I respectfully dissent. Sadly, the majority opinion places this Court in the position of being an apologist for "one of the least excusable acts for which a lawyer can be disciplined." *Matter of Walton*, 251 N.W.2d 762, syllabus 1 (N.D.1977).

The Petersons were Gray's clients before he brought Lochow into the joint representation for the probate of Robert Peterson's estate. Shortly after Robert's death, Gray and Lochow both persuaded Susan Peterson to transfer $75,000 to their trust account. Gray used the trust account "to pay for airline tickets, motel and restaurant charges, cash advances, service station charges and transfers to a personal [account]. None of the withdrawn funds were used in connection with the Robert H. Peterson Estate." Finding of Fact 17. "At the time that the funds were withdrawn by Gray, no accounting or notice was provided to Mrs. Peterson." Finding of Fact 18.

Before this Court, Gray misrepresents that the proposed sanction is essentially the same as imposed on Lochow. "Michael Lochow was disciplined and his license was suspended for six months by the Minnesota Supreme Court and the North Dakota Supreme Court for mishandling the [Petersen] estate." Gray's Brief at 7. "This sanction ... is also unfair when the facts of this case are compared to that of Michael Lochow, who received basically the same sanctions as what the Board is proposing for Gray." Gray's Brief at 19. In this case, the Board has recommended Gray receive a *fixed* six-month suspension, and pay the costs of the disciplinary proceeding. Lochow's license was suspended *indefinitely*, with other significant conditions:

> "We order that Michael R. Lochow's certificate of admission to practice law in this state be indefinitely suspended, effective August 1, 1993, and that he not be eligible to petition for reinstatement for a period of six months. We further order that Lochow pay costs and expenses of $1,067.33. We further order that if Lochow is reinstated to practice law in this state, he shall be subject to two years supervised probation under a North Dakota attorney and shall maintain trust accounts, books, and records as required by the North Dakota Rules of Professional Conduct."

*Matter of Disciplinary Action Against Lochow*, 502 N.W.2d 252, 255 (N.D.1993). Lo-

barment or suspension of attorneys at law may not be deemed a limitation upon the

general powers of the supreme court to suspend or disbar for professional misconduct."

chow's license remains suspended today, more than two-and-a-half years later.

The majority excuses Gray because his conduct included the period when his partnership with Lochow was coming to an end. Yet, Gray did not leave the practice of law in any legal sense, and, as conceded during oral argument, he and Lochow continued in a joint venture relative to this client throughout the course of misconduct by both. The liabilities of joint venturers are the same as those of partners. *Thompson v. Danner*, 507 N.W.2d 550, 556 (N.D.1993).

The majority rationalizes: "The lack of dishonest or selfish motive is a mitigating factor which is applicable to this proceeding." Neither the hearing panel nor the Board made such a finding. Gray's use of trust funds to pay his own bills, unrelated to estate business, reflects nothing but a selfish motive.

The majority cites as a mitigating factor, "which the Board did not consider," that "Gray has no other disciplinary record" and notes, in what appears to be a type of double counting, "he was a relatively inexperienced lawyer." However, Conclusion of Law 5 states: "A mitigating factor is the absence of a prior disciplinary record." The absence of a prior record was a factor already considered by the Board in arriving at its recommended discipline, and therefore is not a new matter which warrants different discipline. *Lochow* at 255.

I would impose the sanction recommended by the Board.

NEUMANN, J., concurs.