In re Petition for DISCIPLINARY ACTION AGAINST Bradley K. ANDERSON, an Attorney at Law of the State of Minnesota.

No. C6–96–48.

Supreme Court of Minnesota.

Oct. 30, 1997.

Henry C. Granison, Asst. Director, Office of Lawyers Professional Responsibility, St. Paul, for petitioner.

Bradley K. Anderson, Sauk Rapids, for respondent.

OPINION

PER CURIAM.

On April 19, 1996, this court publicly reprimanded respondent for neglecting his client's employment law matters and placed him on two year's supervised probation subject to numerous conditions. *In re Anderson,* 546 N.W.2d 298 (Minn.1996). The Director of the Office of Lawyers Professional Responsibility petitioned for revocation of probation and further discipline of respondent alleging that respondent had refused to cooperate with the Director's office regarding his probation conditions. The Director further alleges that respondent had committed several additional counts of misconduct by neglecting the matters of several clients and retaining client funds for several years after representation had ceased.

Following a hearing, the referee found that respondent failed to cooperate with the Director's office by failing to respond to the Director's communications and failing to respond to discovery until compelled by the referee. Further, the referee found that respondent neglected the matters of five clients and wrongfully retained funds belonging to nine clients in violation of several provisions of the Minnesota Rules of Professional Conduct. The referee's recommendation of a disciplinary sanction of suspension from the practice of law for an indefinite period but not less than two years has been adopted by the Director and is proposed as the appropriate sanction to be imposed by this court.

Respondent was admitted to practice law in Minnesota in 1989. On January 8, 1996, the Director filed a petition for disciplinary action against respondent for serious neglect of a client's matter that caused the client's employment law complaint to be dismissed with prejudice. That same day, the Director's office and respondent filed a stipulation wherein respondent admitted that he neglected the employment law matters of his client Randy Rakauskas, and that his conduct violated Minn. R. Prof. Cond. 1.3 (requiring attorney diligence and prompt representation of a client), 1.4 (requiring an attorney to keep a client informed), 3.2 (requiring an attorney to expedite litigation) and 8.4(d) (prohibiting attorney conduct prejudicial to the administration of justice). Further, respondent admitted that his failure to timely return $2,478 of Rakauskas' $4,800 retainer violated Minn. R. Prof. Cond. [1.15(b)(4) ] (requiring an attorney to pay client funds in possession of attorney to which client is entitled) and 1.16(d) (requiring an attorney to refund un-

earned fee payment). The stipulation agreement recommended that the appropriate disciplinary action was a public reprimand and a two-year supervised probation subject to numerous conditions. On April 19, 1996, this court entered its order imposing a disciplinary sanction of public reprimand and respondent was placed on supervised probation for a period of two years with conditions. *In re Anderson,* 546 N.W.2d at 298–99.[1]

Due to the respondent's failure to do anything to implement this court's order, the Director's office filed a petition and supplementary petition for revocation and further disciplinary action and respondent filed responses to those petitions. The referee filed his findings of fact, conclusions of law, and recommendation with the court on April 14, 1997. Because respondent did not order a transcript, the referee's findings and conclusions are conclusive. Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR). The referee made the following findings with respect to the numerous allegations of professional misconduct in the Director's petition.

### 1. Noncooperation

#### a. Failure to Respond to Director's Correspondence

In reference to this court's order of April 19, 1996, the Director's office mailed several letters to respondent between May 1996, and August 1996, requesting that he submit within a prescribed time limit the following: (1) a list of four attorneys willing to supervise; (2) an inventory of all active client files; (3) a written plan outlining office procedures; and (4) all original trust account books and records. After respondent failed to respond to

the first three letters, the Director's office mailed one letter per week for three weeks requesting that respondent personally appear at specified times at the Director's office. Although most of the letters were sent to the same address respondent continues to use, and were sent by both regular and certified mail, respondent did not check his mail in a timely manner and did not receive the bulk of the certified letters because he failed to claim them. However, respondent did eventually receive the letters sent by first class mail and was aware that the Director was seeking to implement the terms of this court's disciplinary order, but respondent did nothing in response to the Director's inquiries. Respondent claimed that because he did not respond, the Director should have known that he was not practicing law, a claim the referee found to be "nonsensical" as well as untrue because respondent did prepare wills for Phyllis and Albert Vogt on or about May 9, 1996. Furthermore, although respondent claimed there had been no activity in his trust accounts from March 1996 through May 1996, he failed to reveal to the Director, until compelled by discovery, that those accounts held more than $2,350 in client funds acquired as long as six years earlier.

In response to the Director's petition herein, respondent essentially denied that he had done anything to harm anyone and accused the Director of abuse of power and misconduct for libeling him and sought to have the Director fired from her position. The referee considered and rejected the issues raised in respondent's responses as facially not credible.

---

**1.** The conditions of respondent's supervised probation were as follows:
  a. Respondent shall cooperate fully with the Director's Office in its efforts to monitor compliance with this probation and promptly respond to the Director's correspondence * * *.
  b. Respondent shall abide by the Minnesota Rules of Professional Conduct.
  c. Respondent shall be supervised by a licensed Minnesota attorney, appointed by the Director * * *.
  d. Respondent shall cooperate fully with the supervisor in his/her efforts to monitor compliance with this probation * * *.

  e. Respondent shall initiate and maintain office procedures which ensure that there are prompt responses to* * *communications from clients, courts and other persons * * *.
  f. Within 30 days * * * respondent shall provide to the Director* * *a written plan outlining office procedures * * * [and] shall provide progress reports as requested.
  g. Respondent shall maintain books and records * * * [and] make all books and records pertaining to his office and trust accounts available * * * to the Director upon request * * *. *Anderson,* 546 N.W.2d at 298–99.

### b. Noncooperation with Discovery Requests

After the petition for revocation was filed, the Director engaged in discovery seeking, in part, a listing of clients, correspondence regarding termination of services, and trust account documents. The Director submitted to respondent interrogatories and requests for the production of documents; however, respondent failed to respond to these requests until the referee ordered him to personally bring his records and appropriate responses to the Director's office on December 16, 1996. Although respondent apologized for the Director's "inconvenience," he offered no meritorious defense for his failure to cooperate with discovery

### 2. Benoit Distributing, Inc. Matter

On July 7, 1992, John Benoit Distributing, Inc. (BDI) retained respondent to collect on delinquent accounts. Respondent worked on this account during the summer and fall of 1992, but then did little to nothing to pursue the matter. On various occasions after January 1, 1993 however, when Mr. Benoit inquired of respondent concerning the collection activity, respondent made generic positive responses despite the fact that he was doing essentially nothing. Then, in or about April 1996, Mr. Benoit requested that respondent return all of the collection files so that BDI could hire a collection agency to service its delinquent accounts. Although Mr. Benoit made several phone calls to respondent, and respondent made several promises to get back to him, respondent still retained the BDI files as of the April 4, 1997 hearing before the referee. Respondent indicated to the referee that he would return the files "as soon as he has time." Furthermore, up until just prior to the April 4, 1997, hearing, respondent still retained $553.27 in his trust account for BDI and had made no attempt to deliver funds to his client since December 15, 1992. The only proof respondent offered to the referee regarding delivery of those funds to BDI was a receipt for certified mail without any documentation regarding the content of that mail.

### 3. Dale Kuperis and Robin Weilege Matter

In 1990, Dale Kuperis retained respondent to obtain an uncontested marital dissolution from his wife, Robin (n/k/a Robin Weilege). Robin Weilege provided the $500 retainer Dale Kuperis paid to respondent on October 23, 1990. Almost four years later, on August 25, 1994, Kuperis paid another $135 to respondent to cover the filing fee. During those four years, respondent prepared a summons and petition and proposed marital termination agreement which he provided to Kuperis and Weilege in January 1991. Kuperis signed the agreement on March 4, 1991, and took several months to return it to respondent. Respondent revised the summons and petition on July 29, 1991, then did nothing further, despite numerous efforts by Kuperis and Weilege to get respondent to take the steps necessary to finalize the dissolution, including payment to respondent of the filing fee. In the meantime, Kuperis and Weilege had amicably separated and had each established new relationships. Kuperis and Weilege finally completed the marriage dissolution acting *pro se* in 1995. In similar fashion to the Benoit matter, *supra*, just prior to the April 4, 1997 referee hearing, respondent claimed to have returned to Kuperis $285 from respondent's trust account, but the only proof respondent offered to the referee regarding the return of those client funds, acquired in 1990 and 1994, was a certified mail receipt.

### 4. Bonnie Wubben (Rask) Matter

In April 1991, Bonnie Wubben (n/k/a Bonnie Rask) retained respondent to represent her concerning some tax issues. Between April 9, 1991, and January 21, 1992, respondent prepared and filed Wubben's 1989 tax returns with the Minnesota and federal tax agencies. Aside from sending along with those returns some letters making very general inquiries concerning Wubben's tax status, respondent did nothing to represent Wubben in reference to her tax issues with those agencies. Wubben made several phone calls to respondent at the law firm where respondent had his practice during this time, but was unable to reach him. During her

last phone conversation with the law firm's office, Wubben was told that respondent left the firm and she was left without any information as to where he had gone. Although respondent claimed to have sent a letter to Wubben informing her of his new address, Wubben claimed she never received it. The referee found that other than for respondent's alleged letter, he made no effort to contact Wubben. Again, just prior to the April 4, 1997 hearing, respondent claimed to have returned to Wubben client funds from his trust account but the only proof he offered to the referee was a Federal Express receipt.

### 5. Raymond Fuller Matter

On March 18, 1993, Raymond Fuller paid a $300 retainer to respondent in connection with some debt problems. Agricultural Services had begun foreclosure proceedings against Fuller and he had some other outstanding judgments against him. Respondent did directly and positively assist Fuller with these concerns to Fuller's benefit, but stopped abruptly on June 27, 1994. Respondent claimed he had "resigned" from representing Fuller by 1995. However, he never informed Fuller of that fact and failed to return Fuller's files, corporate records, or the balance of Fuller's retainer in respondent's trust account. Fuller retained a new attorney who was able to obtain from respondent possession of many of Fuller's files in or about March 1996, but was unsuccessful in obtaining Fuller's corporate records and corporate seal. As of the April 4, 1997 hearing, respondent still retained Fuller's corporate records and corporate seal because he "had not gotten around" to returning them. The referee noted that Fuller blamed respondent for the loss of a home, farm, and business; however, due to a failure of proof the referee did not find that respondent was in fact responsible for those losses. Again, just prior to the April 4, 1997 hearing, respondent claimed to have returned $761.55 to Fuller, but offered as proof to the referee only a Federal Express receipt without other documentation. Further, it is possible that even if respondent did make payment of $761.55 to Fuller, respondent may still retain some of Fuller's money in the trust account because a

$600 check written to Agricultural Services on Fuller's behalf may not have been cashed.

### 6. Phyllis and Albert Vogt Matter

In the spring of 1996, Phyllis and Albert Vogt retained respondent to prepare wills and paid him $110 for that service. The Vogts signed their wills on May 9, 1996, and respondent promised to deliver the wills to them within a couple of days. The Vogts did not receive their wills until April 3, 1997, a fact that respondent admitted, but claimed was an honest mistake on his part.

### 7. Retention of Client Funds

As noted, *supra*, respondent's trust account records showed an account balance of $2,350.23 on December 31, 1996. In addition to the amounts owed to BDI, Kuperis, Wubben and Fuller, respondent also owed funds to the following clients in the following amounts: Nuage Challenges, $255.00; Geraldine E. Renner, $105.00; James Zipp, $45.00; Wayne Tomporowski, $10.00; and Blake Long, $228.32. There remains a question as to whether respondent has sufficient funds in his trust account to pay each of these individual accounts. Until just prior to the April 4, 1997 hearing, respondent did nothing to return any retained funds to his clients even though his representation of those clients ceased years ago. In every case, respondent simply claimed that he had no responsibility to return those client funds until each client made a specific request to have the money returned.

### 8. Referee's Conclusions of Law and Recommendation

Regarding the April 4, 1997 hearing, the referee came to the following four conclusions: (1) by failing to respond to the Director's communications, and failing to respond to discovery until compelled by the referee, respondent violated Minn. R. Prof. Cond. 8.1(a)(3) (prohibiting an attorney from knowingly failing to respond to a discipline authority's lawful demand for information), Rule 25, RLPR (requiring an attorney to cooperate with the Director's investigation of misconduct), and the terms of this court's

April 18, 1996 order; (2) respondent's conduct in each of the matters of BDI, Wubben, Fuller and Kuperis & Weilege violated Minn. R. Prof. Cond. 1.3 (requiring an attorney to act with diligence and promptness in client affairs), 1.4(a) (requiring an attorney to keep a client informed), 1.16(d) (regarding the conditions upon which a lawyer can terminate representation of a client), and 3.2 (requiring an attorney to expedite litigation); (3) respondent's conduct in the Vogt matter violated Minn. R. Prof. Cond. 1.3, 1.16(d) and 3.2; and (4) respondent's conduct in the retention of client funds matter violated Minn. R. Prof. Cond. 1.15(b)(3) (requiring an attorney to maintain records of trust account transactions) and 1.16(d).

The referee recommends that this court suspend respondent from the practice of law for an indefinite period but not less than two years, order compliance with Rule 25, RLPR, concerning the return of client funds and property, and compel respondent to submit to psychological evaluation as a condition for reinstatement.

This court has stated that the purpose of attorney discipline is "not to punish the attorney, but to protect the courts, the public, and the profession and safeguard the administration of justice." *In re Munns*, 475 N.W.2d 82, 84 (Minn.1991) (citing *In re Flanery*, 431 N.W.2d 115, 118 (Minn.1988)). Essentially, attorney discipline proceedings "protect the public from attorneys who are unable to properly discharge their duties" by deterring attorney misconduct. *In re Montpetit*, 528 N.W.2d 243, 246 (Minn.1995).

When determining the appropriate discipline for attorney misconduct, we "consider the nature of the misconduct, the cumulative weight of the violations, and the harm to the public and the profession." *In re Munns*, 475 N.W.2d at 84. Further, we weigh the specific facts of each case against any mitigating or aggravating circumstances and look to "prior cases [as] helpful by way of analogy." *In re Isaacs*, 451 N.W.2d 209, 211 (Minn.1990). Although the referee's recommendation is given great weight, we have the "final responsibility to determine the appropriate discipline." *In re Boyd*, 430 N.W.2d 663, 664 (Minn.1988).

In *In re Munns* we stated that "[a]n attorney on probation should be especially careful to assure compliance with obligations imposed on him in his capacity as a lawyer" and ordered a two-year suspension where Munns refused to cooperate with the terms of his probation by failing to provide the director with an active client file and tax information, neglected another client matter, and refused to cooperate in the new investigation. 475 N.W.2d at 85 (citing *In re Haugen*, 425 N.W.2d 835, 836 (Minn.1988)). In *In re Madsen* we stated that "supervised probation is not appropriate because [the attorney] has refused to cooperate or even communicate with the director's office." 426 N.W.2d 434, 436 (Minn.1988) (suspending Madsen indefinitely for failing to cooperate with the Director's office and neglecting three separate matters of a single client). In this case, respondent has similarly refused to cooperate or communicate with the Director's office by failing to answer any of the Director's correspondence. Respondent had to be compelled by the referee before he would even respond to the Director's discovery requests.

Regarding trust account violations, in *In re Miley* we suspended indefinitely for at least two years an attorney who continued trust account violations and committed additional client related misconduct while on probation. 486 N.W.2d 759 (Minn.1992). We have clearly advised the bar that trust account violations would "almost invariably result in lengthy suspension at the very least * * *." *In re Lochow*, 469 N.W.2d 91, 98 (Minn. 1991). In this case, respondent has held in his trust account funds belonging to nine clients for as long as six years after ceasing work on those client accounts.

Regarding neglect of client affairs, in *In re Graham* we suspended an attorney indefinitely for a period of not less than 18 months for neglecting client matters, disregarding court orders, and failing to cooperate with the Director's office while on supervised probation. 436 N.W.2d 782 (Minn.1989). Similarly, in *In re Rockne* we indefinitely suspended an attorney for not pursuing a client's claim, failing to return the client's phone calls, and failing to cooperate with disciplinary proceedings, stating "respondent

has shown indifference not only to the rights of his client, but to the officials charged with policing the profession and this court. His conduct gives us no choice but to order his indefinite suspension * * *." 375 N.W.2d 28, 30 (Minn.1985). In this case, respondent neglected the matters of BDI, Wubben, Fuller, the Vogts and Kuperis & Weilege. In each of those matters respondent accepted client funds but then neglected to pursue the client's interests. He was either unavailable to take client phone calls or promised to get back to the client regarding a matter, but never did. With the exception of the Vogt matter, respondent's neglect of these clients occurred prior to this court's 1996 disciplinary order, however, respondent continued to retain their funds in his trust account years after representation ended and he continued to retain those funds while on probation.

Respondent's refusal to cooperate with the Director's office while on supervised probation and his additional misconduct in neglecting the matters of five clients and retaining client funds warrants serious discipline. Therefore, we conclude that the appropriate sanction for respondent's misconduct is an indefinite suspension for a period of not less than two years. Respondent shall comply in all respects with Rule 26, RLPR. If respondent seeks reinstatement, he shall also comply fully with Rule 18, RLPR, and shall submit to appropriate psychological evaluation.